## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Delaware Sports Complex, LLC | ) | Case No. 17-11175(KG) |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |

### MEMORANDUM ORDER

The Court is deciding important issues for Delaware Sports Complex, LLC (the "Debtor") and the Town of Middletown (the "Town"), and a matter of great local interest. The issues are:  (1) whether the Levels Road Sports Complex Ground Lease Agreement, dated February 24, 2016, between Debtor and the Town (the "Lease") (Debtor Exhibit 1), a non-residential lease, was terminated before Debtor's bankruptcy filing, and (2) whether the Town's interest as landlord may be subordinated to the lien of the post-petition lender if required under the Debtor's financing agreement.  The Court conducted an evidentiary hearing on July 21 and 31, 2017 (the "Hearing").

### Background

Delaware Sports Complex, LLC, was originally an entity to be formed with members Scott Lobdell, Matt Richter and Brian Ellis.  They had as a concept the development of 170 acres in the Westown area of Middletown, Delaware, as a sports complex with athletic fields and buildings devoted to sports and entertainment.  Because they lacked funds, Lobdell, Richter and Ellis could not bring their grand idea to fruition.

When the Debtor entered into the Lease, the limited liability company had not been formed despite the Lease provision in which Debtor represented and warranted that it "is a limited liability company duly formed and validly existing under the laws of Delaware. . . ."  Lease, §6.1.  It was not "formed and validly existing" until February 28, 2017.

On February 1, 2017, the Town issued a notice of default of terms of the Lease (Debtor Exhibit 2) which is further discussed below.  The Debtor was formed thereafter and at some point Mr. Dan Watson ("Watson") purchased Lobdell's and Ellis' interests in the Debtor.[1]  Watson presented no explanation of what happened to Richter's interest. Watson now claims that he is the sole manager of the Debtor, but he introduced no evidence of his position with the Debtor at the Hearing.

Following the submission of the notice of default, and while Watson was attempting to cure the defaults, the Town commenced a summary possession action in Justices of the Peace Court No. 9 on March 17, 2017.  Debtor Exhibit 16.  The Debtor thereafter filed its voluntary bankruptcy petition on May 23, 2017, which stayed the summary possession action.

<u>Existence of Debtor</u>

The Court must first address an issue it raised at the hearing.  The Debtor was not formed until February 28, 2017, more than a year after it entered into the Lease.  The Court

---

[1]  The certificate of formation for the Debtor was not an exhibit introduced at the Hearing. The Court has also not seen an operating agreement addressing Debtor's ownership and governance.  It is therefore unclear what authority Watson has to act on Debtor's behalf.

asked the parties to address the question of whether the Lease was void *ab initio* because Debtor did not exist when it executed the Lease.  What prompted the Court's question was a decision by Judge Gregory M. Sleet in *IOENGINE LLC v. Imation Corp.*, 2017 WL 39563 (D. Del. Jan. 4, 2017).  There, the District Court addressed a patent assignment to a non-existing limited liability company which was not formed until the day after the assignment.  *Id.* at *3.  The District Court found that IOENGINE was a *de facto* limited liability company.  *Id.* at *5.  The District Court held that a limited liability company is analogous to a corporation for which *de facto* status is recognized. *Id.* at *4.  The District Court found that there was a *bona fide* attempt to organize IOENGINE, and IOENGINE was formed long before the lawsuit in which it status was at issue.  *Id.* at *5.  The District Court distinguished IOENGINE from the party in *Leber Assocs., LLC v. Entm't Group Fund, Inc.*, 2003 WL 21750211 (S.D.N.Y. July 29, 2003), where *de facto* status was denied because there was no evidence that anyone drafted or attempted to file a certificate of formation until after commencement of the law suit.  *Id.*

Here, the certificate of formation (the filing of which brought Debtor into existence per 6 *Del. C.* § 18-201(b)) was not filed until after the Town sent the notice of default. The Court is satisfied, however, that Debtor could enter into the Lease although it was not formed until later.  When an agent contracts for a non-existent principal which is subsequently formed, the principal may assume the contract.  *Boulden v. Albiorix, Inc.*, 2013 WL 396254 (Del. Sup. 2013).  The Debtor's original members were, in effect, promoters of the preformation entity.  *See also Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A. 2d 728, 744 (Del. 2006) (promoter allowed to enter into contracts that bind nascent

corporation).  Moreover, the Town is now estopped[2] from denying the existence of Debtor, first, because it accepted Debtor as a limited liability company throughout; and second, because the Town conceded that Debtor's formation was sufficient to cure the default.

<u>The Lease</u>

The Lease is an odd document.  In it, the Town leased the "Property" defined as containing "319.69 acres," although there appears to be no real dispute that the Lease was actually for 170 acres.  The acreage of the Lease is not directly before the Court, but the Court notes that the Lease grants Debtor an easement for ingress and egress which would not have been necessary had the 319.69 acres been leased, Lease, § 1.2, and there is a draft record plan which Debtor prepared for 170 acres.  Next, the use of the leasehold does not contain any time limits for development.  It provides that "[Debtor] shall construct, maintain and operate" the sports fields and facilities the exact timing, number and location of the [sports] fields to be constructed by [Debtor] in [Debtor's] sole discretion. . . ."  Lease, ¶ 2.2.  The Lease is for 99 years at one dollar per year, making the absence of a development timeline strange.  The Town also obligated itself to "operate and maintain . . . at its expense, a lagoon, treatment facilities, and a pumping station or stations' for waste

---

[2]   *See Leber Assocs.*, 2003 WL at *11, where, applying Delaware law, the court discussed estoppel and quoted the general proposition that "it is well settled that a person who contracts or otherwise deals with a body of people as a corporation thereby admits that they are a corporation and is estopped to deny their incorporation . . . .," citing 8 Fletcher Cyclopedia of the Law of Private Corporations § 3910 (Perm. Ed. 2001).

4

water.  Lease, ¶ 2.2.  The cost of doing so appears to be significant.  There is, however, a "time is of the essence" provision.  Lease, § 21.15.

It is clear to the Court that the Debtor and the Town entered into the Lease with the firm understanding that Debtor would actively develop the leasehold with sports fields and buildings and that has not happened.  While the Lease does not require Debtor to adhere to any timeline, and the Lease is an unambiguous agreement which the Court will strictly construe without resort to extrinsic evidence, *GMG Capital Investments, LLC v. Athenian Venture Partners I, L.P.*, 36 A. 3d 776, 779-80 (2012), the implied covenant of good faith plays in the Court's decision.

Defaults and Cures

The Lease provides the means for "Early Termination" which the Town is asserting.  Lease, § 2.4.  First, Debtor must commit a default of its obligations.  Lease, § 17.2.  Second, Debtor has an opportunity to cure the default.  Lease, § 17.2.  Third, the Town must give written notice of the default as specified in the Lease.  Lease § 17.1.  Fourth, the default must remain for 30 days after the Debtor receives the default notice.  *Id.*  Fifth, after the expiration of the 30 days, if the default is of "a nature that it cannot be cured within such thirty (30) day period," then as long as Debtor is "proceeding to cure [the default] in good faith," the default is deemed not to continue.  Lease, § 17.2.

On February 1, 2017, Morris Deputy, Town Manager, wrote Mr. Brian Ellis for Debtor, and gave notice of the following defaults:

1.  Tenant is not listed with the State of Delaware as a limited liability company duly formed and validly existing under the laws of Delaware

5

with the full power to enter into the lease in accordance with Section 6.1 [of the Lease].

2. Tenant has not provided the required bonding as presented by the Town of Middletown to the Tenant in accordance with Section 6.4 [of the Lease].

3. Tenant has not executed a Recoupment Agreement with the Town of Middletown and Delaware Department of Transportation in accordance with Section 13.1 [of the Lease].

The notice of default gave Debtor thirty days, or until March 5, 2017, to cure the listed defaults. In reality, the 30 days ran from Debtor's receipt of the letter, or March 8, 2017.[3]

## 1. Formation of Limited Liability Company

The Court previously noted that the Debtor was not formed until after the notice of default. Debtor cured the default on February 28, 2017, when it filed the Certificate of Formation with the Delaware Secretary of State. Debtor therefore timely cured the default.

## 2. The Required Bonding

The Lease required the following:

6.4    Bonding Requirement. Prior to the commencement of any construction, Tenant shall secure at its expense a performance Bond for the benefit of the Landlord in the amount sufficient to revert the Property to be developed, or portion thereof if work is to be done in stages, to canary grass. Any such Bond will be released once construction of the fields or other improvements covered by the bond is completed. Tenant further agrees to secure the same performance bond for any subsequent phases or any remaining aspects of the Project.

---

[3] The Court finds that with the exception of the default date, the service of the letter was appropriate.

Watson was unchallenged in his testimony that he made significant efforts to identify and cure the noticed default, and that he received no helpful response from the Town. Watson met with the Town in an effort to learn what the bonding requirement meant, the amount of the bond, what sureties were acceptable and other related questions. Watson received no answers from the Town and therefore did what he thought best. He obtained a commitment from a bank (BB&T Bank) for letters of credit which equaled the amount of the bond that the Town demanded ($290,695). The Court finds that Debtor cured the default through his letters of credit commitment which equaled the Town's bonding request. Debtor acted in good faith and received no help from the Town. Debtor therefore did not default on the bonding requirement.

4.    The Recoupment Agreement

There was extensive testimony about the Debtor's failure to enter into a recoupment agreement with the Delaware Department of Transportation ("DelDOT"). The issue arises from Debtor's obligation to "promptly observe and comply with all present and future laws, ordinances, requirements, order, directive, rules and regulations of the Federal, State and local governments and all other governmental authorities affecting the Property or appurtenances thereto or any part thereof. . . ." Lease, § 13.1.

Testimony at the Hearing revealed that if the Debtor's development of the leasehold is to proceed, DelDOT will require either a full traffic impact study or that Debtor participate in a recoupment agreement. Both choices would be very expensive for the Debtor, in excess of $2 million. Debtor initially told the Town and DelDOT that it would sign the recoupment agreement and in the unexecuted record plan which Debtor

7

submitted to the Town (Town Exhibit 7), Debtor indicated that it would sign the recoupment agreement. Debtor never did sign the recoupment agreement and made it clear at the Hearing that it has no present intention of signing.

The Town cites the Lease, § 13.1, as obligating the Debtor to comply with "all present and future laws," and regulations of governmental authorities and the recoupment agreement is just that. The Lease provision also requires prompt observance and compliance.

In every contract, and the Lease is a contract, there is an implied covenant of good faith and fair dealing which insures that the reasonable expectations of the parties are fulfilled. *Southern Track and Pump, Inc. v. Terex Corp.*, 852 F. Supp. 2d 456, 467 (D. Del. 2012). "Thus, the Court 'must focus on what the parties likely would have done if they had considered the issues involved.'" *Id.*, *quoting QVT Fund LP v. Eurohypo Capital Funding LLC I*, 2011 WL 2672092, at *13 (Del. Ch. July 8, 2011). Delaware law controls. Lease, § 21.1. Delaware law is quite clear that every contract implies the covenant of good faith and fair dealing. *Winshall v. Viacom Intern., Inc.*, 55 A. 3d 629, 636 (Del. Ch. 1986) ("Modern contract law has generally recognized an implied covenant to the effect that each party to a contract will act in good faith towards the other with respect to the subject matter of the contract.") The implied covenant should be invoked only when the contract makes it clear that the parties would have agreed on the point at issue had they thought to include the matter in the contract. *Winshall v. Viacom Intern., Inc.*, 55 A. 3d at 637. Therefore, the Court is charged with "assess[ing] the parties' reasonable expectations at the time of contracting and not rewrite the contract to appease a party who later wishes

to rewrite a contract he now believes to have been a bad deal." *Nemec v. Shrader*, 991 A. 2d 1120, 1126 (Del. 2010).

It is the Debtors' failure to enter into a recoupment agreement that creates an uncured default. Debtor indicated at the Hearing that it may want to develop only six or so fields and because of the lighter traffic the recoupment agreement would not be needed. The Lease, however, makes the parties' expectations clear. The Debtor was in good faith to develop the leasehold as numerous fields and facilities. Although the Lease does not contain timelines for the development of the fields and buildings, the "time is of the essence" provision in the Lease establishes the Debtor's and the Town's expectation that the entire project would be accomplished and promptly. It is perfectly clear to the Court that had the parties to the Lease focused on their understanding and agreement that Debtor would fully develop the property promptly, they would have included time limits. The Debtor's failure to promptly enter into the recoupment agreement based on its intention to develop only a portion of the property and to fulfill only a portion of its plan is a default which Debtor failed to cure in a timely fashion. The default renders the Lease terminated.

<u>Subordination of the Town's Fee Simple Interest</u>

Debtor seeks to subordinate the Town's fee simple interest in the property to the

Debtor's credit agreement (the "DIP"). The Lease provides that:

> [Debtor] shall have the right to grant a leasehold mortgage or otherwise
> encumber this Lease or any sublease of all or any part of the Property and
> [Debtor] may assign its rights hereunder. Such leasehold mortgage shall
> encumber the leasehold interest created by this Lease; [the Town] agrees to
> execute a commercially reasonable Subordination and Non-Disturbance
> Agreement or similar agreement with [Debtor's] lender.

Lease, § 7.2. The Court's decision that the Lease was terminated makes it unnecessary to

address the subordination issue.

<u>Conclusion</u>

The Court concludes that Debtor has defaulted on its Lease obligation and that the

Town properly terminated the Lease.

SO ORDERED.


Dated: August 21, 2017

KEVIN GROSS, U.S.B.J.